Filed 12/17/13  P. v. Gonzalez CA6

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H037432 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. CC939623) |
| v. | |
| ALEJANDRO GONZALEZ, | |
| Defendant and Appellant. | |

Defendant Alejandro Gonzalez appeals from a judgment of conviction entered after a jury found him guilty of four counts of aggravated sexual assault of a child under 14 by a perpetrator who was more than 10 years older than that child (Pen. Code, § 269).[1] The trial court sentenced defendant to state prison for a term of 60 years to life.  On appeal, defendant contends that trial court erred by:  (1) denying his motion to dismiss pursuant to section 654, and (2) excluding evidence of the numerical split in the votes for acquittal in a prior trial.  We find no error and affirm.

---

[1]     All further statutory references are to the Penal Code unless otherwise indicated.

## I.  Statement of Facts

## A.  Prosecution Case

Salvador L. and his wife had two children, Alan and Melissa.  Alan was born in 1989 and Melissa was born in 1993.  Both Salvador and his wife worked, and Nena Gonzalez provided child care for Alan and Melissa.  From 1996 to 1998, they dropped their children off at Nena's house between 4:15 to 4:30 a.m.  Nena lived with defendant, who is her husband, and their two children.  When Salvador left his children at the Gonzalez house, he would place them on the floor in the living room and cover them with sleeping bags.  The residents of the Gonzalez household were asleep in other rooms.  Nena also provided child care for Lidia M., who was a few months older than Melissa.

Melissa was 17 years old at the time of trial.  After her parents left her at the Gonzalez house, she usually slept on the floor between her brother and Lidia.  While Melissa was sleeping, she was often awakened by pain.  She then realized that defendant was sticking his finger in her vagina.  Defendant molested her several times.  A couple of times, Melissa kicked her legs and said, "Stop.  It hurts."  Defendant either told her to go back to sleep or held her legs down with his other hand.  She did not tell her parents because she thought that they would not believe her.

Melissa also recalled an incident in which she heard Lidia saying, "No.  No.  Stop.  Leave me alone."  Defendant was sitting in front of Lidia.  This incident occurred early in the morning while it was still dark.  On another occasion, Melissa saw Nena standing in the doorway while defendant molested her.

When Melissa was 14 years old, which was about 10 years after Nena stopped providing child care for her, she told her therapist about the molestations.  Melissa also told her father, but he did not believe her.  Melissa did not talk to Lidia about the incidents.

Salvador recalled that Melissa had told him while she was still in child care with Nena that defendant touched her vagina.  Salvador did not believe her because he trusted

2

defendant. He asked her, "Are you telling the truth?" She replied, "I'm just kidding." After Melissa's therapist reported the molestations, Salvador asked Melissa why she did not continue to tell him what had happened. Melissa told him that she thought that he would not believe her because he had not believed her the first time.

Doris S., Lidia's mother, testified that Nena provided child care for Lidia between May 1992 and July 1998. When she dropped Lidia off at child care at 5:00 a.m., Melissa and Alan were already there. She remembered that Alan slept on the floor, and she placed Lidia on the floor next to Melissa. One night, Lidia said, "Momma, I want to tell you something. Just don't tell dad. He's gonna get mad." Lidia then told her that defendant had touched her vagina. Lidia also told her father, and the police were contacted.

Lidia, who was 19 years old at the time of trial, testified that her mother dropped her off at child care when it was dark and everyone in the house was asleep. Sometimes Alan slept on the couch, but he also slept on the floor. Defendant molested Lidia "every other day" by sticking his finger in her vagina. He never touched her anywhere else, though he lay on top of her once.

Since defendant was hurting her, Lidia might have made noise and Melissa might have heard her. When Lidia was not being molested, she did not look to see whether defendant was molesting Melissa. However, she heard Melissa say, "Stop." This could have happened more than once a month.

Based on Lidia's accusations in July 1998, Captain Meynard Gamez interviewed defendant. Defendant told him that he generally left for work between 5:00 a.m. and 5:10 a.m. He also said that the week of July 13, 1998, he left about 6:50 a.m., but that he left at 9:00 a.m. on July 13. When defendant was asked when was the last time that he left as early as 5:00 a.m., defendant said that he could not remember. Defendant was also asked if he had had contact with the children when they were lying on the living room floor.

3

Defendant indicated that he would occasionally cover the children with a blanket so they would not get cold.

Carl Lewis testified as an expert in child sexual abuse accommodation syndrome (CSAAS), which explains behaviors that frequently appear in child molestation cases. According to Lewis, CSAAS is comprised of the following categories: (1) secrecy, (2) helplessness, (3) entrapment and accommodation, (4) delayed, conflicted, unconvincing disclosure, and (5) retraction. Secrecy referred to the offender's creation of an environment of secrecy to convey to the child that the incident was bad and therefore must be kept secret. Helplessness referred to the child's inability to resist the advances of the offender, who usually holds a position of trust with the child and on whom the child is dependent. Entrapment and accommodation signified the child's inability to escape, and thus the child's need to find a way to tolerate the abuse. Delayed and unconvincing disclosure referred to the delay caused by the child's inner conflict, which also caused equivocations that rendered the disclosure unconvincing. Retraction occurred due to the child's desire to avoid the turmoil created by his or her disclosure. According to Lewis, these categories are not present in every case of sexual abuse.

Mary Lou Ritter testified as an expert regarding the collection and preservation of evidence of sexual assault and the determination as to whether a patient's injuries were consistent with her history of sexual assault. Ritter reviewed the records related to Lidia's examination in 1998. In Ritter's opinion, Lidia's exam showed no evidence of trauma, but the absence of trauma did not necessarily mean that she had not been molested.

The parties stipulated: (1) there was a trial in which defendant was charged with sexually abusing Lidia and the jury did not reach a decision, (2) defendant pleaded to one count of annoying or molesting a child in violation of section 647.6, a misdemeanor, and (3) defendant's date of birth is June 3, 1949.

4

## B. Defense Case

Catalina Chavez, defendant's next door neighbor, has known the Gonzalez family for 45 years. During the period between 1996 and 1998, Chavez was a housewife and spent time with Nena on a daily basis while Nena provided child care for children. Chavez heard defendant's car pull out of the driveway between 5:00 and 5:30 a.m. and the children would be picked up by their parents before defendant returned home. She never observed defendant do anything inappropriate with the children. According to Chavez, Nena was awake when the children arrived.

Nena testified that in 1996 Melissa and Alan arrived at her house between 4:50 and 5:00 a.m. and Lidia arrived around 5:30 a.m. Their parents had a key to enter her house. Nena woke up at 5:00 a.m., though sometimes she woke up after they arrived. Both she and defendant woke up at the same time. Defendant usually returned from work around 5:00 or 5:30 p.m. and the children were picked up no later than 2:30 p.m. She never noticed any inappropriate behavior between defendant and the children. She denied ever watching defendant touch Melissa inappropriately.

Maria Eloisa Gonzalez, defendant's sister-in-law, testified that between 1996 and 1999, she, her husband and their four children lived at the same address as defendant but in the larger house. Defendant would usually leave for work between 5:00 and 5:30 a.m. and return between 5:00 and 6:00 p.m. Melissa, Alan, and Lidia arrived around 6:00 a.m.

Alan L., Melissa's brother, testified that he was nine years old in 1996. He would normally go to Nena's house between 2:00 a.m. and 4:00 or 4:30 a.m. They slept mostly on the floor. A few times Nena was up when they arrived. Defendant left for work before 7:40 a.m. He never saw anyone touch either Melissa or Lidia inappropriately. Melissa and Lidia had never told him that they had been touched inappropriately.

Erika Stilwell, defendant's neighbor, testified that she lived two houses away from defendant's house. Nena babysat her when she was younger. Defendant never did anything inappropriate to her.

5

Lissette Aguilar, defendant's niece, testified that she lived in defendant's house from mid-June 1998 until November 1998. She slept on the couch in the living room. While she was there, Melissa, Alan, and Lidia would arrive about 5:00 a.m. Nena and defendant would get up when the children arrived. She never observed defendant behaving inappropriately. Defendant left no later than 5:15 a.m. for work. In 1998, however, she testified that defendant did not leave until 7:00 a.m. and the children arrived between 5:00 and 5:30 a.m.

Defendant testified that in 1996 he usually woke up at 5:00 a.m., left for work at 5:30 a.m., began working at 6:45 or 6:50 a.m., and returned home at 5:00 or 5:30 p.m. The children were dropped off at 4:50 or 5:00 a.m. His wife always got up when he did. He denied ever touching Melissa or Lidia in a sexual way. After the first trial, defendant pleaded no contest to a misdemeanor charge of annoying or molesting a child because he did not "have money to pay another attorney to have another jury." He needed to get back to work to support his family and the negotiated plea agreement allowed him to do so.

Dr. James Crawford-Jakuviak, the medical director of the Center for Child Protective Services at Children's Hospital in Oakland, examined the report and photographs of Lidia's exam in 1998. The photographs showed a normal, healthy child and there were no physical findings that she had been sexually abused.

Dr. Rahn Minagawa testified as an expert in the area of clinical psychology and forensic psychology. He interviewed defendant, defendant's wife, and defendant's oldest son. He also administered to defendant the Millon Clinical Multiaxial Inventory. This test indicates whether a person has any psychological or psychiatric conditions. Based on the test results, "there were no significant findings that would suggest that [defendant] has a personality disorder or any type of acute psychiatric or psychological condition."

6

## II. Discussion

### A. Motion to Dismiss Pursuant to Section 654

Defendant contends that the trial court erred by refusing to dismiss prosecution in this case pursuant to section 654.

In 1999, defendant was prosecuted for committing lewd acts against Lidia, but the jury was unable to reach a verdict and he pleaded no contest to a misdemeanor count of molesting a child. During the investigation in 1998, the police learned that Melissa slept in the living room while Lidia was molested at defendant's residence and identified her as a possible victim. After Melissa's mother contacted the police, Officer Ayoob went to their residence. Melissa's mother told the officer that her husband had recalled that Melissa had told him that defendant had touched her groin area. When her husband asked Melissa if she was lying, she admitted lying and "joking." The officer then "tried to interview Melissa but she would not speak" to him. Lidia told the police that she had never seen defendant do anything to the other children and they had never told her that defendant molested them. The prosecutor did not file charges naming Melissa as a victim in the 1999 case.

Prior to trial, defendant brought a motion to dismiss the charges. He argued that section 654 barred prosecution of the charges involving Melissa on the ground that they were a significant part of the same course of conduct involving Lidia. Following a hearing, the trial court denied the motion. The trial court found that the prosecution's "investigation was unsuccessful . . . in the view of the People in ferreting out sufficient evidence to justify charging offenses at that time. [¶] . . . I will not interfere and have no authority to interfere in that reasonable exercise of prosecutorial discretion. [¶] Even if there was evidence of crimes against Melissa, the defense has still failed to show, utterly, that *Kellett* applies to require that the crimes against L[i]dia be prosecuted in the same proceeding as the crimes against Melissa. They're not the same acts. They're not the same omissions. They're not even the same course of conduct."

7

Section 654 provides: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision. An acquittal or conviction and sentence under any one bars a prosecution for the same act or omission under any other."

In *Kellett v. Superior Court* (1966) 63 Cal.2d 822 (*Kellett*), the California Supreme Court interpreted the prohibition against multiple punishment under section 654 to include a prohibition against multiple prosecution under certain circumstances. In *Kellett,* the police arrested the defendant, who was standing on the sidewalk with a gun in his hand. On the same day, he was charged with exhibiting a firearm in a threatening manner, a misdemeanor. (*Kellett*, at p. 824.) A month later, in a second proceeding dating from the same disturbance and involving the same firearm, the defendant was charged with felony possession of a firearm by an ex-felon. (*Ibid.*) The defendant pleaded guilty to the misdemeanor charge and brought a motion to dismiss the felony weapons charge as barred by section 654. The trial court denied the motion and the defendant sought a writ of prohibition to prevent trial on the felony charge. (*Kellett*, at p. 824.)

The *Kellett* court explained the parameters and the rationale of section 654's bar against multiple prosecutions. " 'Section 654's preclusion of multiple prosecution is separate and distinct from its preclusion of multiple punishment. The rule against multiple prosecutions is a procedural safeguard against harassment and is not necessarily related to the punishment to be imposed; double prosecution may be precluded even when double punishment is permissible.' " (*Kellett*, *supra*, 63 Cal.2d at p. 825.) The court also explained that the joinder of related offenses, which is permitted under section 954, prevented harassment, avoided repetition of evidence, and saved the state and the defendant time and money. (*Kellett*, at p. 826, fn. 3.) Thus, the court reasoned that "[i]f needless harassment and the waste of public funds are to be avoided, some acts that are

8

divisible for the purpose of punishment must be regarded as being too interrelated to permit their being prosecuted successively. When there is a course of conduct involving several physical acts, the actor's intent or objective and the number of victims involved, which are crucial in determining the permissible punishment, may be immaterial when successive prosecutions are attempted. When, as here, the prosecution is or should be aware of more than one offense in which the same act or course of conduct plays a significant part, all such offenses must be prosecuted in a single proceeding unless joinder is prohibited or severance permitted for good cause. Failure to unite all such offenses will result in a bar to subsequent prosecution of any offense omitted if the initial proceedings culminate in either acquittal or conviction and sentence." (*Id.* at p. 827.)

However, there is an exception to the *Kellett* rule. Section 654 does not bar a subsequent prosecution when "the government, despite reasonable efforts, has been unable to discover the facts necessary to sustain a conviction . . . ." (*People v. Davis* (2005) 36 Cal.4th 510, 558.) "But this exception applies only when the government 'acted with due diligence at the outset but was unable to discover the additional facts necessary to sustain the greater charge.' [Citation.] Whether the government exercised due diligence is a question of fact. [Citation.]" (*Ibid.*)

Here, there is substantial evidence to support the trial court's implied finding that despite the prosecution's due diligence in its investigation of charges involving Melissa, it was unable to discover sufficient facts to sustain the charges involving Melissa. The police identified Melissa as a possible victim and learned of a multiple hearsay statement that she had made to her father and immediately recanted. An officer then attempted to interview her, but she refused to speak to him. Since Lidia had not observed defendant molesting Melissa, Melissa's cooperation with the police at that time was essential to the prosecution of charges involving her as a victim. Defendant argues, however, that due diligence required "a specialist trained in the investigative and interviewing techniques appropriate and effective in these type of cases" to conduct Melissa's interview. In our

9

view, it is entirely speculative as to whether Melissa would have revealed the molestation to anyone else at that time, particularly since she did not disclose defendant's conduct until she was in therapy approximately 10 years after the offenses were committed.

Moreover, the two cases do not fall within the *Kellett* rule. In 1998, defendant was charged with one act of lewd conduct with Lidia, three acts of sexual penetration against Lidia, and three acts of sexual penetration by force against Lidia. The present case involved four acts of sexual penetration against Melissa. Though the acts against both girls allegedly occurred at various times between 1996 and 1998 at defendant's residence, the acts were separate and distinct acts of sexual penetration against separate victims. Thus, the two cases were not "too interrelated to permit their being prosecuted successively." (*Kellett*, *supra*, 63 Cal.2d at p. 827.)

## B. Admissibility of Evidence

Defendant next contends that the trial court erred in excluding evidence of the numerical split of the jury in his previous trial for the offenses against Lidia.

Prior to trial, defense counsel requested that he be allowed to impeach the credibility of Lidia's expected testimony by showing that the jury in the previous trial ended in an 11 to 1 impasse in favor of acquittal. The following exchange then occurred between the trial court and defense counsel: "THE COURT: . . . What inference can a reasonable juror make if it split ten-to-two, one way or another, ten-to-two for guilty. Is she more likely to have been telling the truth, more likely to have not been telling the truth. Ten-to-two not guilty, when the jurors heard her when she was obviously ten years younger? I'm not sure how it helps the jury. [¶] Even if they heard she testified earlier, what's the relevance of the numbers? [¶] . . . [¶] DEFENSE COUNSEL: My honest answer is, I don't know. I hadn't thought about it as to whether or not the split, the numbers of the split made a difference. I think the fact they didn't get a conviction based on what she originally alleged, would go to bias and credibility, which would be relevant

to the jury, whether or not the numbers were relevant to their -- their number of votes for not guilty and number of votes for guilty. I don't know if the jurors would necessarily see that as a negative or positive. [¶] I think the way that I would have phrased that is probably that the jury mistried in favor of acquittal versus an exact number, if you wanted to avoid giving a number, thinking the number isn't relevant. I just hadn't thought about that at all." The trial court ruled, ". . . I'm inclined against allowing the jury split to go to the jury because I don't know what useful inference a juror can make from that. And to the extent it doesn't have a useful inference, it sounds kind of irrelevant to me. As to the split, at least my tentative ruling is that it not go before the jury."

At trial, Doris S. testified that it "really" bothered her that the previous jury did not reach a decision, that she was not "mad," but "disappointed," and that it made her "feel like justice wasn't served." Lidia testified that she had only learned that the jury did not reach a decision a year before the present trial. The parties stipulated that "there was a trial here in [Santa Clara] County where the defendant was charged with sexually abusing L[i]dia and that jury did not reach a verdict."

"'Relevant evidence' means evidence . . . having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) In determining the relevancy of evidence, courts consider whether the evidence tends "'"logically, naturally, and by reasonable inference" to establish material facts such as identity, intent, or motive. [Citations.]' [Citation.]" (*People v. Carter* (2005) 36 Cal.4th 1114, 1166.) "The existence or nonexistence of a bias, interest, or other motive" (Evid. Code, § 780, subd. (f)) is relevant to the credibility of a witness. This court reviews the trial court's determination as to the admissibility of evidence under the abuse of discretion standard. (*People v. Alvarez* (1996) 14 Cal.4th 155, 201.)

Defendant argues that "the need for vindication [for Lidia and her mother Doris S.] arises because their allegations were not *believed* by" the jury in the previous trial, and that "[t]o tell the instant jurors simply that the previous jury did not reach a decision

11

completely neuters the motive evidence at issue into an ambiguous and meaningless piece of information. A split of 11 to 1 in favor of acquittal provides a clear basis for an inference of an impeaching motive, and *this* is the information that should have been conveyed to the current jurors in order to properly assess the testimony of L[idia] and of Doris S."

As defendant points out, the jury's failure to reach a verdict in the previous case may have provided a motive for Lidia and her mother "to fabricate or exaggerate" their testimony to ensure a conviction in the present trial. However, this motive existed regardless of the numerical split of the jury. Moreover, to the extent that Lidia and her mother fabricated or exaggerated their testimony, their testimony from the trial in 1999 provided a much stronger basis for impeachment. Thus, the trial court did not abuse its discretion in excluding this evidence.

### III.  Disposition

The judgment is affirmed.

_____
Mihara, J.

WE CONCUR:

_____
Premo, Acting P.J.

_____
Grover, J.